Jonathan D. CRUMLY, Sr., Cobb County Board of Commissioners, Timothy D. Lee, Chairman, in his official capacity; George Woody Thompson., Jr., Commissioner, in his official capacity; Helen C. Goreham, Commissioner, in her official capacity; Robert J. Ott, Commissioner, in his official capacity; and Joann K. Birrell, Commissioner in her official capacity, Plaintiffs,

v.

COBB COUNTY BOARD OF ELECTIONS AND VOTER REGISTRATION; Janine Everler, Director, in her official capacity, Defendants.

Civil Action No. 1:12–CV–01301–SCJ.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 9, 2012.

10. *See* Fla. Admin. Code r. 72–1.001(5)(a)3; Fla. Admin.Code r. 6A–10.044(4).

Joseph Blackshear Atkins, Office of Cobb County Attorney, Marietta, GA, for Cobb County Board of Commissioners, George Woody Thompson, Jr., Helen C. Goreham, JoAnn K. Birrell, Robert J. Ott and Timothy D. Lee.

Jonathan Dean Crumly, Maner Crumley Chambliss, LLP, Atlanta, GA, for Jonathan D. Crumly, Sr.

Jefferson Moseley Jeter, Jefferson Jeter, Attorney at Law, Atlanta, GA, for Viveca R. Famber–Powell.

Gregg Earl Litchfield, Haynie Litchfield & Crane, Marietta, GA, for Cobb County Board of Elections and Voter Registration and Janine Everler.

### ORDER

STEVE C. JONES, District Judge.

This case involves the reapportionment of the electoral commission districts for the voters of Cobb County, Georgia. The case appears before the Court on a Complaint for Declaratory and Injunctive Relief against the Cobb County Board of Elections and Voter Registration, and its director, Janine Everler. Doc. No. 1.

## Background

This action was originally brought by Plaintiff Jonathan D. Crumly, Sr., against the Cobb County Board of Commissioners, each of the five commissioners named above in their official capacities, the Cobb County Board of Elections and Voter Registration and its Director, Janine Everler. Doc. No. 1.

In his Complaint, Plaintiff challenges the constitutionality of the current Cobb County Board of Commissioners districts under 42 U.S.C. § 1983 and the Equal Protection Clauses of the United States and Georgia Constitutions. Plaintiff alleges that the present districts of the County Commission are so disproportionate in population that they violate the principle of "one person, one vote." Doc. No. 1, p. 2. Plaintiff seeks declaratory and injunctive relief preventing the future use of Cobb County's Board of Commissioners districts. *Id.* Plaintiff also requests that the Court impose a remedial plan for use in the 2012 election cycle and in all future election cycles unless lawfully amended for elections after 2012. *Id.*

After the filing of the Complaint, upon motion of the Board of Commissioners and the individual commissioners (hereinafter collectively referred to as "Board of Commissioners"), the Court permitted realignment of the parties (based on their similar interests and goals in the present litigation) so that the board and its named commissioners were realigned as plaintiffs in this case. Doc. No. 37.

On April 27, 2012, the parties entered into a stipulation [Doc. No. 15] as to certain findings of fact and conclusions of law, which the Court will incorporate into its findings herein.

Cobb County, Georgia is a political subdivision of the State of Georgia and is governed by the Cobb County Board of Commissioners.

Plaintiffs Timothy D. Lee, Helen C. Goreham, Robert J. Ott, JoAnn K. Birrell, and George Woody Thompson, Jr. are members of the Cobb County Board of Commissioners. The Board's chairman, Timothy D. Lee is elected on an at-large basis by all voters in the County. For the purposes of electing the remaining four district commissioners, Cobb County is divided geographically into four single-member electoral districts. Each of the four district commissioners are required to reside in specific districts. Only the registered voters residing in the commissioner's district are eligible to vote for that commissioner's district seat. The residential addresses of the district commissioners are as follows:

**Goreham:** 3528 West Hampton Drive, N.W., Marietta, Georgia 30064

**Ott:** 1477 Pebble Creek Road, S.E., Marietta, Georgia 30067

**Birrell:** 1228 Nottoway Trail, N.E., Marietta, Georgia 30066

**Thompson:** 6280 Austin Drive, Mableton, Georgia 30126

Plaintiff Jonathan D. Crumly, Sr. is a resident and elector of Cobb County, Georgia, who resides in Marietta, Georgia and votes in Commission District 1.

The Court has also granted Viveca R. Famber–Powell, who resides in Mableton, Georgia and votes in Commission District 2 *amicus curiae* status.[1]

The named defendants, the Cobb County Board of Elections and Registration and its director, Janine Everler, have the law-

---

**1.** Ms. Famber–Powell initially sought to intervene in this matter; however, after consideration of applicable authority, the Court denied said motion and permitted *amicus curiae* status so that Ms. Famber–Powell has been allowed to legally comment on the matters before the Court. Doc. No. 44.

ful duty to: receive notices of candidacy and qualifying fees from candidates seeking election to the County Commission; prepare and publish all notices and advertisements in connection with the conduct of elections; transmit to the Secretary of State a copy of any publication in which a call for an election is issued; prepare, equip and furnish all polling places; conduct elections for the county; count all ballots; and certify the results of all elections as prescribed by law.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 2201. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

As stated above, this case involves the "one person, one vote" constitutional principle. As evidenced by the most recent United States decennial census, due to material shifts in the populations within Cobb County's four Commission districts over the past decade, the number of citizens in each of the existing commissioner districts is not equal.

The County Commission districts, as currently configured, are accurately represented by the map at Exhibit 1, Doc. No. 15–1. These existing districts were drawn in 2002 by the Honorable Julie Carnes, Chief Judge of the Northern District of Georgia, under similar, expedited circumstances as the present case—that is because the Georgia Legislature had ended its regular session without redistricting Cobb County based on the population results of the 2000 Census. An equal protection civil action was filed in the United States District Court, Northern District of Georgia weeks prior to the qualification and election deadlines. *Smith, Perry et al. v. Cobb County Board of Elections, et al.*, 314 F.Supp.2d 1274 (N.D.Ga.2002).[2]

According to the 2010 Census, the Board of Commissioners districts, as presently configured, contain approximately the following populations:

| DISTRICT | POPULATION |
| --- | --- |
| 001 | 196,029 |
| 002 | 162,396 |
| 003 | 155,256 |
| 004 | 174,463 |

The four Cobb County Commission districts have not been reapportioned after the 2010 census. The population data for the Cobb County Commission districts from the 2010 Census shows a total population of 688,144 with a corresponding ideal population per district of 172,019 to avoid either diluting or increasing voting strength.[3]

The population data summary for the Board of Commissioners districts as presently configured is in the record at Exhibit 2, Doc. No. 15–2. The evaluation of this population data, broken down by district, results in the following deviations from the

2. Said case involved two different cases and two sets of plaintiffs, referred to in the written order as the Smith plaintiffs or the "Smith case" and the Perry plaintiffs or the "Perry case." *Id.* at 1279, n. 1. The "Smith case" involved the School Board and the "Perry case" involved the Cobb County Commission. In the federal reporter and in subsequent citations to said opinion, the case is styled utilizing the *Smith* designation first; however, as recognized by both parties in the case *sub judice*, the *Perry* case is the one with precedential value for the present purposes. In an effort to avoid confusion, the Court will cite the case in the present opinion utilizing both case names as *"Smith, Perry."*

3. *Id.* at 1285 ("Apportionment plans are evaluated under the one-person, one-vote principle by determining the amount by which the population in each district deviates from the size of the ideal district, and by determining the overall deviation between the two districts with the greatest disparity in population. Accordingly, by using that number and dividing by four, an 'ideal district size' for the four Commission voting districts that would result in nearly perfect equality among the populations" is determined).

ideal population per district as presently configured:

| DISTRICT | POPULATION | IDEAL POPULATION | DEVIATION | DEVIATION PERCENTAGE |
|---|---|---|---|---|
| 001 | 196,029 | 172,019 | 24,010 | 14.0% |
| 002 | 162,396 | 172,019 | −9,623 | −5.6% |
| 003 | 155,256 | 172,019 | −16,763 | −9.7% |
| 004 | 174,463 | 172,019 | 2,444 | 1.4% |

The overall population deviation is 23.70%. In addition, the voting strength of voters in District 1 is significantly diluted, while voters in District 3 have a disproportionately large voting strength. As a result, the existing Board of Commissioners districts are unconstitutionally malapportioned.

The Georgia General Assembly is the only legislative body with the duty and authority to reapportion the County Commission districts during a regular or special session.[4] During the 2012 regular session of the Georgia General Assembly, several members of the Cobb delegation to the Georgia House of Representatives submitted House Bill 905 ("HB 905") in an effort to redistrict the Cobb County Commission districts such that the malapportionment evident from the 2010 census data would be resolved. HB 905 passed out of the Georgia House of Representatives on February 21, 2012. HB 905 did not pass out of the Georgia Senate without amendment. A copy of HB 905 as passed by the Georgia House is found in the record at Exhibit 3, Doc. No. 15–3. The County Commission districts, as configured in HB 905 (the "HB 905 Plan"), are accurately represented by the map at Exhibit 4, Doc. No. 15–4. The configurations of the HB 905 Plan contain approximately the following populations:

| DISTRICT | POPULATION |
|---|---|
| 001 | 172,200 |
| 002 | 172,582 |
| 003 | 171,425 |
| 004 | 171,871 |

The population data for the HB 905 Plan from the 2010 Census shows a total population of 688,078 with a corresponding ideal population per district of 172,019 to avoid either diluting or increasing voting strength. The population data summary for the HB 905 Plan is in the record at Exhibit 5, Doc. No. 15–5. The evaluation of this population data broken down by district results in the following deviations from the ideal population per district as presently configured:

| DISTRICT | POPULATION | IDEAL POPULATION | DEVIATION | DEVIATION PERCENTAGE |
|---|---|---|---|---|
| 001 | 172,200 | 172,019 | 181 | 0.11% |
| 002 | 172,582 | 172,019 | 563 | 0.3% |
| 003 | 171,425 | 172,019 | −594 | −0.4% |
| 004 | 171,871 | 172,019 | −148 | −0.1% |

The overall population deviation is 0.67%.

4. *Id.* at 1281, 1286.

Plaintiff Crumly has no objection to the HB 905 Plan. Plaintiff Crumly states that it contains minimal population deviations and "maintain[s] and preserve[s] existing communities of interest within each County Commission District, provides compact districts and provides clarity to citizens as to which County Commissioner represents their surrounding community." Doc. No. 1, p. 11, ¶ 23. The Board of Commissioners argue that the HB 905 is problematic because it does not adequately take into account the differences between and among the districts. The Board notes that the House Bill 905 proposal "moves District 2 deeply into the former District 4, gutting the heart of District 4—the community of Mableton .... essentially destroy[ing] Mableton's sense of community and place[s] it in a district with residents of East Cobb, which is an entirely different community." Doc. No. 14, p. 17.[5]

On March 29, 2012, the Georgia Senate State and Local Governmental Operations Committee passed a substitute to HB 905 (the "Senate Compromise"). A copy of the Senate Compromise as passed by the Georgia Senate State and Local Govern-ment Operations Committee is found in the record at Exhibit 6, Doc. No. 15–6. The Senate Compromise did not pass out of the Georgia Senate without amendment. The County Commission districts, as configured in the Senate Compromise (the "Senate Compromise Plan"), are accurately represented by the map at Exhibit 6, Doc. No. 15–6. The configurations of the Senate Compromise Plan contain approximately the following populations:

| DISTRICT | POPULATION |
| --- | --- |
| 001 | 171,994 |
| 002 | 171,965 |
| 003 | 172,322 |
| 004 | 171,797 |

The population data for the Senate Compromise Plan from the 2010 Census shows a total population of 688,078 with a corresponding ideal population per District of 172,019 to avoid either diluting or increasing voting strength. The population data summary for the Senate Compromise Plan is found in the record at Exhibit 7, Doc. No. 15–7. The evaluation of this population data broken down by district results in the following deviations from the ideal population per district as presently configured:

| DISTRICT | POPULATION | IDEAL POPULATION | DEVIATION | DEVIATION PERCENTAGE |
| --- | --- | --- | --- | --- |
| 001 | 172,200 | 172,019 | 181 | 0.11% |
| 002 | 171,440 | 172,019 | –579 | –0.34% |
| 003 | 172,754 | 172,019 | 735 | 0.43% |
| 004 | 171,684 | 172,019 | –335 | –0.19% |

The overall population deviation is 0.31%.

Plaintiff Crumly has no objection to the Senate Compromise Plan. Plaintiff states that it has minimal population deviations and maintains and preserves existing communities of interest, provides compact districts and clarity to citizens and keeps more than 95 % of the census designated areas of Mableton together, consistent with sound reapportionment principles. Doc. No. 1, p. 13, ¶ 29. The Board of

**5.** In an April 27, 2012 conference call with the Court, counsel for the remaining defendants Board of Elections and Director Everly, stated that they have no position on any of the maps at issue.

**1340**

Commissioners state that the Senate Compromise Plan does not take the differences between and among the districts into account. Doc. No. 14, p. 17. The Board argues that the compromise plan restores a portion of the Mableton community cut by HB 905, but "still cuts deeply into the community" by lengthening District 1 "such that residents of Acworth in far northwest Cobb would be thrown into a district which includes Smyrna at the other end of the community" .... both "pleasant places to live, [but] ... but very different in terms of their housing patterns and neighborhood concerns." Doc. No. 14, p. 17–18.

The Cobb County legislative delegation in the Georgia General Assembly has traditionally consulted with and sought input from the Board of Commissioners of Cobb County regarding the county's preferred district map. *See Smith, Perry*, 314 F.Supp.2d at 1280. To that end, once the 2010 census data became available, members of the Board of Commissioners began studying the data and preparing a new district map to present to the delegation for its consideration, aware that only the General Assembly had the legal authority to enact any map. This effort by the Board of Commissioners culminated in its official approval of a map for recommendation. That map and associated population data were approved by the Board of Commissioners at a regularly scheduled and noticed public meeting on February 28, 2012. The County Commission districts, as configured by the proposal of the Board of Commissioners ("BOC Plan") are accurately represented by the map in the record at Exhibit 9, Doc. No. 15–9.

The BOC Plan districts contain approximately the following populations:

| DISTRICT | POPULATION |
|---|---|
| 001 | 172,200 |
| 002 | 171,440 |
| 003 | 172,754 |
| 004 | 171,684 |

The population data for the BOC Plan districts from the 2010 Census shows a total population of 688,078 with a corresponding ideal population per district of 172,019 to avoid either diluting or increasing voting strength. The population data summary for the BOC Plan is found in the record at Exhibit 10, Doc. No. 15–10. The evaluation of this population data broken down by district results in the following deviations from the ideal population per district as presently configured:

| DISTRICT | POPULATION | IDEAL POPULATION | DEVIATION | DEVIATION PERCENTAGE |
|---|---|---|---|---|
| 001 | 172,200 | 172,019 | 181 | 0.11% |
| 002 | 171,440 | 172,019 | –579 | –0.34% |
| 003 | 172,754 | 172,019 | 735 | 0.43% |
| 004 | 171,684 | 172,019 | –335 | –0.19% |

The overall population deviation is 0.76%.

The Board of Commissioners has no objection to and prefers the BOC Plan. The Board states that the "BOC Plan takes all of the traditional districting principles into account and balances them as much as possible while still complying with the one-person, one-vote requirement and § 5 of the Voting Rights Act" keeping East Cobb, South Cobb, and Mableton in tact. Doc. No. 14, p. 18.

Plaintiff Crumly states that the BOC plan should not be granted consideration as an expression of State policy because

the Board of Commissioners have no constitutional authority to adopt a redistricting plan. Doc. No. 28, p. 14.

In addition to the maps referenced above, there was also a map presented by Senators Doug Stoner and Steve Thompson under the label "Senate Bill 535" or "SB 53." Said map and its corresponding population statistics are found in the record at Doc. No. 32. It appears that SB 535 was referred to the Senate State and Local Government Operations Committee on March 21, 2012, but never left this Committee for consideration by the full Senate or the House of Representatives. Doc. No. 33, p. 6, n. 7. Through her amicus brief, Ms. Famber–Powell proposed that the Court take guidance from this map. All plaintiffs oppose said request on various grounds (i.e., it is not an expression of State policy, that it has a high population deviation, and it fails to appreciate the core of District 2).

The evaluation of this population data broken down by district for SB 535 results in the following deviations from the ideal population per district as presently configured:

| DISTRICT | POPULATION | IDEAL POPULATION | DEVIATION | DEVIATION PERCENTAGE |
|---|---|---|---|---|
| 001 | 172,217 | 172,019 | 198 | 0.12% |
| 002 | 171,435 | 172,019 | –584 | –0.34% |
| 003 | 170,740 | 172,019 | –1,279 | –0.74% |
| 004 | 173,686 | 172,019 | 1,667 | 0.97% |

The overall population deviation is 1.71%.

The 2012 regular session of the General Assembly has now ended. No reapportionment plan for the Cobb County Commission was adopted and no special session for the purpose of reapportioning these districts was called by the Governor.

Qualifying for elections for County Commission is scheduled to be held May 23 through 25, 2012; primary elections will be held on July 31, 2012 and absentee ballots must be mailed pursuant to the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. § 1973ff, et seq., as amended forty-five (45) days prior to the primary elections or June 15, 2012. The Board of Elections has informed the Court that it is imperative for preparatory purposes to have a map in place by May 14, 2012.

Absent the relief sought herein, the Board of Elections will accept qualifications of candidates for these positions using the existing malapportioned district boundaries. Given the inaction by the Legislature, this Court must step in and create a constitutional reapportionment plan.

In consideration of the limited time period for ruling prior to the pending elections, the Court *sua sponte* issued an expedited briefing and hearing schedule. Doc. No. 4. The Court held an evidentiary hearing on May 7, 2012.[6] During this hearing, the Court allowed the parties to present evidence and argument. The Court also presented the parties with a proposed map

---

**6.** In order to ensure that all interested parties were aware of the litigation, on April 27, 2012, the Court required the Cobb County Board of Commissioners to provide public notice (through newspaper and its website) of the hearing date and the time period for intervening.

that it drafted with the assistance of its technical expert, Regina Harbin Wright, and consultant, Brian Knight of the Georgia Legislative and Congressional Reapportionment Office. All parties were permitted the opportunity to comment on said map. The Court's conclusions of law are as follows.

## I. Declaratory Judgment

The Declaratory Judgment Act provides: "in a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such determination, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

In this case, Plaintiff Crumly asks the Court to declare his rights as to the continued use of malapportioned districts to elect members of the Cobb County Commission and whether use of said malapportioned districts violate the Equal Protection clause of the Fourteenth Amendment to the United States Constitution, the Constitution of the State of Georgia, and 42 U.S.C. § 1983.[7]

"It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote ...." through the Equal Protection Clause and other provisions of the United States Constitution. *Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964).

■ The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST., amend. XIV, § 1. "The Equal Protection Clause [requires] that

electoral districts be 'of nearly equal population, so that each person's vote may be given equal weight in the election of representatives.'" *Voinovich v. Quilter*, 507 U.S. 146, 160–161, 113 S.Ct. 1149, 1159, 122 L.Ed.2d 500 (1993). This principle, also known as, "one person, one vote" is applicable to local redistricting plans. *Bodker v. Taylor*, No. 1:02–CV999, 2002 WL 32587312, at *6 (N.D.Ga. June 5, 2002) (citing *Avery v. Midland Cnty.*, 390 U.S. 474, 480, 88 S.Ct. 1114, 1118, 20 L.Ed.2d 45 (1968)) ("[W]hen the State delegates lawmaking power to local government and provides for the election of local officials from districts specified by statute, ordinance, or local charter, it must insure that those qualified to vote have the right to an equally effective voice in the election process.").

It is a deprivation of voters' constitutional rights to elect commissioners from districts of substantially unequal population in that the "votes of some residents have greater weight than those of others; in both cases the equal protection of the laws has been denied." *Avery*, 390 U.S. at 480–81, 88 S.Ct. 1114. In essence, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555, 84 S.Ct. 1362. Accordingly, the United States Supreme Court has "held that a claim asserted under the Equal Protection Clause challenging the constitutionality of a State's apportionment of seats in its legislature, on the ground that the right to vote of certain citizens was effectively impaired since debased and diluted, in effect presented a justiciable controversy subject to adjudica-

---

7. As noted above, the Court has permitted the realignment of the parties so that the Cobb County Board of Commissioners and each named commissioner are now party plaintiffs, instead of defendants. Due to the severe time restraints, the realigned plaintiffs have not filed a Complaint in this case. The Court will accordingly utilize the singular plaintiff designation when referring to the Complaint.

tion by federal courts." *Id.* at 556, 84 S.Ct. 1362 (citing *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

There is also a justiciable controversy under 42 U.S.C. § 1983, which provides for a civil action/equity suit for deprivation of civil rights and states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

The Plaintiff's claims under the Georgia Constitution are considered dual constitutional claims in that under Georgia law, the equal protection clause of the Georgia Constitution, providing that "[n]o person shall be denied the equal protection of the laws" is considered identical to the equal protection clause of the Fourteenth Amendment. *See* GA. CONST. art. 1, § 1, ¶ 2, cl. 2; *DeJulio v. Georgia,* 276 F.3d 1244, 1252 (11th Cir.2001) (citing *Nodvin v. State Bar of Ga.,* 273 Ga. 559, 544 S.E.2d 142, 145 (2001) ("Because the protection provided in the Equal Protection Clause of the United States Constitution is coextensive with that provided in Art. 1, Sec. 1, Par. 2, of the Georgia Constitution of 1983, we apply them as one.")). Accordingly, the determinations made herein are conclusive as to the state constitutional claims, as well. *See Tarter v. James,* 667 F.2d 964, 970 (11th Cir.1982) ("Many of plaintiff's state constitutional challenges are based upon provisions which essentially mirror those upon which the federal constitutional claims are premised. The

determinations made in . . . this opinion are conclusive as to these state claims as well.").

■ In light of the above findings of fact, joint stipulation of the parties [8], and applicable law, the Court concludes that Plaintiff is entitled to a declaratory judgment that, as a result of the data now available from the 2010 census, the Cobb County Commission districts are unconstitutionally malapportioned in that they violate the one person-one vote principle of the Equal Protection clauses of the United States and Georgia Constitutions. The Court specifically finds that the continued use of the existing malapportioned districts to elect members of the County Commission violates Plaintiff's constitutional rights under the Equal Protection clauses of the Fourteenth Amendment to the United States Constitution and of the Constitution of the State of Georgia—and also results in liability for which injunctive relief can be granted under 42 U.S.C. § 1983.

## II. Injunctive relief

■ An injunction is available when a "legal right has been infringed by an injury for which there is no adequate legal remedy and which will result in irreparable injury if the injunction does not issue." *Alabama v. United States Army Corps of Eng'rs,* 424 F.3d 1117, 1127 (11th Cir.2005)

■ In regard to the injunctive relief sought, the Court finds as follows. Leaving the existing Commission district lines in place with their imbalances in population deprives the Plaintiff and voters of Cobb County of the benefit of the one person, one vote principle of the Equal Protection Clause. Absent the injunctive relief sought, candidates for the Board of Commission seats for Districts 2 and 4 will qualify from unconstitutionally malappor-

8. Doc. No. 15.

tioned districts, in violation of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. Plaintiff has no adequate remedy at law and no other way to guarantee his rights in connection with the upcoming candidate qualifying and election of Commission members, other than through the relief sought in this lawsuit. Plaintiff will suffer irreparable harm if candidate qualifying and the election are allowed to proceed under the current district boundary lines, and the injury will continue until the existing lines are declared to be unconstitutionally malapportioned and their use enjoined.[9]

Therefore, in light of the above-stated findings, Plaintiff is entitled to injunctive relief, barring the use of the existing districts for the 2012 election cycle and beyond, unless the districts are lawfully amended for use in elections following the 2012 cycle. **The Cobb County Board of Elections is hereby ENJOINED from accepting qualifications and conducting elections under the existing malapportioned Commission district map.**

### III. Remedial relief

As for the remedial relief requested by Plaintiff, i.e., imposition of a plan by this Court, the Court finds as follows.

The Georgia General Assembly has the duty and responsibility to reapportion the County Commission districts during a regular or special session. *Miller v. Johnson,* 515 U.S. 900, 915, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995) ("It is well settled that 'reapportionment is primarily the duty and responsibility of the State.'"); *Smith, Perry,* 314 F.Supp.2d at 1286.

The 2012 session of the Georgia General Assembly has ended without the enactment of a map/plan that creates constitutionally proportional districts. It is undisputed that the Georgia Legislature will not be reconvening prior to the upcoming 2012 primary and general elections for the district commissioner members of the Cobb County Board of Commissioners.

■ "Federal courts are not allowed to intervene in state apportionment matters in the absence of a violation of federal law." *Id.* The Court finds that unless it adopts a remedial plan, there will not be a constitutionally apportioned plan for use in the 2012 primary and general elections for the district commissioner members of the Cobb County Board of Commissioners, as the present plan based on the 2010 census no longer meets the requirements of the state and federal law. Because the existing districts are unconstitutional, in the absence of action by the General Assembly, this Court has the power and responsibility to intervene and remedy the constitutional violation through enactment of an interim redistricting plan pending later legislative action. *See Larios v. Cox,* 314 F.Supp.2d 1357, 1359–1360 (N.D.Ga.2004) (holding that "where a federal court has declared an existing apportionment scheme unconstitutional ... 'it becomes the 'unwelcome obligation' ... of the federal court to devise and impose a reapportionment plan pending later legislative action.'").

After consideration of the specialized skill required in map drawing and reapportionment, as indicated above, the Court appointed the Georgia Legislative and Congressional Reapportionment Office (and its necessary staff, to wit: Regina Harbin Wright and Brian Knight), as the Court's technical advisor and consultant in this matter. Doc. No. 20.

In fashioning the remedial plan, the Court has been mindful of the Constitution

---

**9.** *See Wright v. Dougherty Cnty., Ga.,* 358 F.3d 1352 (2004) (setting forth standard for standing in terms of harm to individuals who reside in under-represented districts).

and the important goals of minimizing population deviations among the districts, while still respecting traditional redistricting principles. The Court has also taken into account the provisions of the Voting Rights Act.

Prior to the May 7, 2012 evidentiary hearing in this case, the Court visited the Georgia Legislative and Reapportionment Office and prepared a draft map as its starting point. The Court did so based upon its understanding of the case law that the map had to be its own independently created map and that it would not be proper to adopt one of the parties' proposed maps without submitting said proposed map to the Department of Justice for the preclearance process.[10] In preparing the draft map, the Court began with the existing map drawn by Judge Carnes in 2002. The Court followed the doctrine of minimum change and its understanding from expert, Regina Wright, that the people of Cobb County generally prefer to use geographic boundaries.[11] The Court's main concern was equalization of the population, compliance with the Voting Rights Act, and clean lines—for example, Old Highway 41 was a highway feature which was utilized to shift the existing line between Districts 1 and 3. The Court took no political breakdowns into consideration and did not consider the addresses of the incumbents until after it was satisfied with its initial draft.

After completion of the Court's draft, the Court presented the draft to the parties for comment at the May 7, 2012 evidentiary hearing.[12] The Court has taken said comments into consideration in issuing its final map as will be discussed, *infra.* The Court has adopted the final version of its remedial map/plan attached to this order as Exhibit A and labeled "CobbCC–FEDCT–2012" (hereinafter "the Final Plan").[13] In this map, the Court has attempted to harmonize all of the one person, one vote principle, traditional redistricting principles, and the requirements of the Voting Rights Act as follows.

## A. Minimizing population deviations while respecting traditional districting principles

■■ The most important goal in fashioning a remedial plan is to minimize the population deviations among the districts, while also respecting the traditional districting principles of compactness, contiguity, the preservation of the core of the existing districts, and the preservation of significant political and geographic subdivisions, whenever possible. *See Abrams v. Johnson,* 521 U.S. 74, 95, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997) (slight deviations in population equality in court-ordered plans are justified in furtherance of significant state policies or unique features.) Further, small differences in the populations of districts may be justified if doing so preserves cores of prior districts or avoids

---

**10.** There is no dispute that in light of the May 14, 2012 deadline which the Board of Elections must have a map to begin their election preparation work, there is not enough time to submit a map for preclearance, as such process generally takes sixty days or more.

**11.** The "minimum change" doctrine "acknowledges that redistricting is fundamentally a legislative task, best handled by those elected representatives in whose hands the voters have placed their trust to handle such

matters, rather than an unelected federal judge." *Bodker,* 2002 WL 32587312, at *5.

**12.** The Court's initial draft map and population statistics are found in the record at Doc. No. 43.

**13.** Additional attachments include: Exhibit B (population statistical sheet); Exhibit C (overlay of the existing boundary with the final plan); and Exhibit D (the legal description of the final plan).

contests between incumbents. *Karcher v. Daggett,* 462 U.S. 725, 740, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). Protecting incumbents from being drawn out of their existing districts such that they would have to run for election against other incumbents has traditionally been a priority in Georgia redistricting. *Smith, Perry,* 314 F.Supp.2d at 1307.

### 1. Population deviations

■ Court-ordered districts are held to higher standards of population equality than legislative ones. *Chapman v. Meier,* 420 U.S. 1, 26–27, 95 S.Ct. 751, 765, 42 L.Ed.2d 766 (1975). A court-ordered plan should " 'ordinarily achieve the goal of population equality with little more than de minimis variation' " in order to comport with the one-person, one vote principle of the Equal Protection clause. *Id.* "[A]bsolute population equality [is] the paramount objective." *Abrams,* 521 U.S. at 98, 117 S.Ct. 1925; *see also Wright v. City of Albany,* 306 F.Supp.2d 1228, 1233 n. 8 (M.D.Ga.2003) (indicating that the court may not draw a remedial map "in the same politically freewheeling way that the legislative body could have, but must follow a highly restrictive course designed solely to meet the constitutional requirements and not to foster the political agenda of any party.").

In devising and evaluating a remedial plan for compliance with the equal protection clause, "the usual measure is the percent deviation from the ideal population." *Bodker,* 2002 WL 32587312, at *6. "The ideal district population is basically the average population per the number of districts. Deviation from the ideal population is calculated as the overall population deviation for the county, rather than taking a district by district view." *Id.* The Court must articulate precisely the reasons for any variations from *de minimis* deviation from the ideal population number. *Id.* (citing *Abrams,* 521 U.S. at 98–99, 117

S.Ct. 1925; *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975)).

"[T]he Supreme Court has not established an absolute 'cut-off' for the maximum overall deviation that an apportionment plan may have before it violates" the Constitution. *Smith,* 314 F.Supp.2d at 1285. In a prior decision, the Supreme Court stated that its "decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified...." *Brown v. Thomson,* 462 U.S. 835, 842–843, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983). However, the Court notes that in a concurring opinion in the *Cox v. Larios* case (reviewing the State of Georgia's legislative reapportionment plans), Supreme Court Justice John Paul Stevens noted that the appellant had invited the Court to "weaken the one-person, one-vote standard by creating a safe harbor for population deviations of less than 10 percent, within which districting decisions could be made for any reason whatsoever." 542 U.S. 947, 949, 124 S.Ct. 2806, 159 L.Ed.2d 831 (2004). Justice Stevens noted that "[t]he Court properly reject[ed] that invitation." *Id.* In light of said opinion from Justice Stevens, the Court will not engage in a 10% and/or safe harbor analysis. *See Karcher,* 462 U.S. at 731, 103 S.Ct. 2653 (" 'The whole thrust of the 'as nearly as practicable' approach is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case.' Adopting any standard other than population equality, using the best census data available, would subtly erode the Constitution's ideal of equal representation.") (citations omitted). Furthermore, even if the Court were to engage in such an analysis, the Court notes that the devia-

tions in the Court's Final Plan are *de minimis* and fall well below 10%.

In the Court's Final Plan, the population deviations are as follows:

| DISTRICT | POPULATION | IDEAL POPULATION | DEVIATION | DEVIATION PERCENTAGE |
|----------|-----------|------------------|-----------|----------------------|
| 001 | 172,011 | 172,019 | −8 | 0.00% |
| 002 | 172,060 | 172,019 | 41 | 0.02% |
| 003 | 171,930 | 172,019 | −89 | −0.05% |
| 004 | 172,077 | 172,019 | 58 | 0.03% |

The overall population deviation is 0.09%.[14]

The Court finds that its Final Plan achieves the goal of population equality with little more than *de minimis* variation and comports with the one-person, one vote principle of the Equal Protection clause.

### 2. Traditional districting principles

As noted above, the traditional districting principles are compactness, contiguity, preservation of the core of the existing districts and community interests, preservation of significant political and geographic subdivisions, and incumbent considerations.

#### a. compactness

Compactness is an aesthetic factor in that there should be no strangely shaped or bizarre looking districts.[15] The Court finds that its Final Plan respects the compactness principle.

#### b. continuity

Continuity involves being able to walk to each part of the district without having to go through another district.[16] The Court finds that its Final Plan respects the continuity principle.

#### c. preservation of the core of the existing districts and community interests

"People who share communities of interest logically belong within the same ... district." *Johnson v. Miller*, 922 F.Supp. 1556, 1562–1563 (S.D.Ga.1995) (citing *Miller v. Johnson*, 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (discussing significance of communities of interest)).

The focus of the Board's arguments has been on preserving the core of existing districts and communities of interest in terms of how different parts of the community interact. Plaintiff Crumly and Ms. Famber–Powell's *amicus curiae* brief and arguments also focus heavily on this factor.

The Court will begin with the Board's arguments concerning the draft map prepared by the Court. The Board states that the cores of the districts "have existed for at least thirty years and in some instances over fifty years." Doc. No. 14, p. 6. The Board's concerns focus on three areas currently located in District 1 under the existing district map.[17] Those areas

---

**14.** The Court notes that in comparing the existing and other submitted plans, its overall population deviation of 0.09% is the lowest. Existing = 1.51%; HB 905 = 0.67%; Senate Compromise = 0.31%; BOC = 0.76%; Amicus = 1.71%.

**15.** Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court–Drawn Redis-tricting Plans*, 73 GEO. WASH. L.REV. 1131, 1158 (2005).

**16.** *Id.* at 1159.

**17.** The Board further stated that, with this exception, it was "satisfied with virtually all aspects of the court's initial redistricting plan." Doc. No. 41, p. 2.

are: Town Center Community Improvement District (CID), McCollum Field (Cobb County's airport), and Kennesaw State University. Doc. No. 41, p. 2. The Board presented evidence through Chairman Lee and the present District 1 Commissioner, Helen C. Goreham, regarding the representative history of the areas at issue. Commissioner Goreham specifically testified that she has a history of working with all three of these areas through various commission projects and/or constituent issues that she has worked on in these areas. For example, at Kennesaw State University, she worked on a smarter traffic plan. At the airport, she was involved in starting the Airport Advisory Board and in the Town Center CID, she has become involved in their monthly meetings. When asked why another commissioner, specifically Commissioner Birrell (in District 3), could not represent the area, Commissioner Goreham testified that she saw no reason why Commissioner Birrell could not competently represent these individuals; however, in her opinion, "nothing beats experience in actually working with the public on issues."

After consideration, the Court agrees that these are core areas of existing District 1 such that they should remain in District 1. In addition, in following its overall governing principle of minimum change, the Court finds that moving these three areas out of District 1 would constitute a significant change and also would result in harm to the citizens of Cobb County in that the areas at issue, which are major industrial/financial areas, would lose the first-hand knowledge and historical working relationship that has been established with industry and the elected commissioner for the area. Accordingly, in reviewing its draft map and enacting its

Final Plan, the Court has decided to retain the core of District 1, as well as lessen the significance of the change in District 1 by allowing the three areas at issue to remain in District 1 and shifting the boundary lines between District 1 and District 3 in the Acworth and Elizabeth areas. The Court does so based on the minimum change principle, equal population principle, and the evidence in the record indicating that "much of the City leadership [of Acworth] supports District 3 moving as far west as Cobb Parkway." Doc. No. 29, p. 3.

The Court will next consider Plaintiff Crumly's arguments. In his comments to the Court's draft, Plaintiff Crumly stated that the integrity of and solidification of the East Cobb community interest will be sustained through allowing the precincts known as Timber Ridge 01 and Roswell 01 to move from District 3 to District 2. Doc. No. 42. Plaintiff Crumly states that this change is depicted in the BOC Plan, HB 905, and the Senate Compromise. Plaintiff Crumly indicates that the HB 905 and Senate Compromise are expressions of State policy. Plaintiff Crumly also indicates that such change is supported by the testimony of Commissioner Robert J. Ott, the current Cobb County Commissioner for District 2. However, the Court notes that Commissioner Ott's testimony focused on the deficiencies of Ms. Famber–Powell's *amicus curiae* plan. When asked by the Court in implied reference to the Court's draft plan, if there were other problems with the makeup of the district, Commissioner Ott replied "not really."

After review, the Court is unable to follow Plaintiff Crumly's suggested change under equal population principles and the doctrine of minimum change. The current population of Roswell 01 is 3360 and Timber Ridge 01 is 3360. Together, the two precincts have a population of 6422.[18]

18. Population figures were obtained from the Court's technical expert, Regina Harbin Wright.

Moving those two precincts into District 2 would greatly askew the population for District 2 so as to make it overpopulated in violation of the one person, one vote principle. This, the Court cannot do in its effort to make the populations of each district as equal as possible.

The Court further notes that the precincts of Roswell 01 and Timber Ridge 01 were in District 3 under the existing map. While Plaintiff Crumly's argument is legitimate under the principle of giving consideration (not deference) to expressions of county and State policy, the Court finds that for purposes of its remedial plan authority, such a significant change of moving these two precincts would not be proper for this Court to enact in an effort to minimize significant changes for the voters of Cobb County, Georgia.[19]

The Court will next consider Ms. Famber–Powell's *amicus curiae* arguments. Ms. Famber–Powell argues that the Court's draft splits the City of Marietta into three different commission districts. Therefore, she has proposed changes to the draft plan to this regard. Following Ms. Famber–Powell's suggestion, however, would cause the Court to ignore the doctrine of minimum change and the policy expression in the record that all four county commissioners represent some portion of the City of Marietta and that no special effort be taken to maintain Marietta in less than four districts. Doc. No. 29–1, p. 3, ¶ 5. In regard to the doctrine of minimum change, the Court notes that the City of Marietta was split into multiple districts in the existing map. The Court further notes that the present Commissioner for District 2, Robert Ott testified that Ms. Famber–

Powell's proposal would "tear the heart out of the district." The Court notes that it is difficult to maintain the primary goal of population equalization by placing Marietta in one district, as even counsel for Ms. Famber–Powell noted that, in her proposed map, all of Marietta is not located in the same district. In addition, the overall population deviation of 1.71% in Ms. Famber–Powell's proposed map was the largest of all of the proposed maps submitted. After review of the record, the Court finds Ms. Famber–Powell's arguments concerning the City of Marietta to be unpersuasive.

Counsel for Ms. Famber–Powell further stated that in regard to the line between Districts 2 and 4, the line used in her proposed map is the same line used by the Senate maps that have already been subject to preclearance. Counsel asked the Court to consider this instructive. The Court finds that this argument is related to Ms. Famber–Powell's City of Marietta arguments and, for the reasoning above, the Court declines to uphold said argument. Furthermore, the location of the Senate map lines is not determinative of the present commission district lines.

Ms. Famber–Powell further states that in District 3, the unincorporated area of East Cobb has, by design, a different land use plan than the rest of the city oriented parts of Cobb County in that it does not have the large commercial centers that you find in Marietta or Smyrna. Counsel for Ms. Famber–Powell states that it makes sense not to include unincorporated areas of Kennesaw and Marietta in District 3. No evidence was submitted in support of Ms. Famber–Powell's argument. The

19. When faced with similar policy arguments in the *Smith, Perry* case, the Court concluded that it could not "adopt in toto—a proposed, but unenacted, plan by the commission;" because of Voting Rights Act considerations; however, the Court could consider the plan. 314 F.Supp.2d at 1291. Similarly, in the case

*sub judice*, the Court will not give deference to either of the plans at issue (HB 905, Senate Compromise, or BOC Plan); however, the Court finds that it may consider said plans as expressions of governmental and county policy. Such consideration has been given in this case.

Board presented evidence, through the testimony of commissioner Ott, showing that the main difference between unincorporated and incorporated areas is that incorporated areas have a government of their own. The Court finds that there is insufficient evidence in the record to uphold Ms. Famber–Powell's arguments regarding District 3.

### d. preservation of significant political and geographic subdivisions

The Court understands this factor to mean avoiding splits of cities or other municipalities.[20] The Court recognizes that its map does split the cities/areas of Acworth, Kennesaw, Marietta, Roswell, and Smyrna. The Court finds that such splits were justified in light of its primary goal of population equalization and based upon the remaining traditional redistricting factors discussed above.

### e. incumbent considerations

As stated above, protecting incumbents from being drawn out of their existing districts such that they would have to run for election against other incumbents has traditionally been a priority in Georgia redistricting. *Smith, Perry,* 314 F.Supp.2d at 1307. In the Court's plan, the incumbents have not been drawn out of their existing districts.

### B. Voting Rights Act

■ "The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *Georgia v. Ashcroft,* 539 U.S. 461, 490, 123 S.Ct. 2498, 2517, 156 L.Ed.2d 428 (2003).

■ This court must comply with the racial-fairness mandates of Section Two of the Voting Rights Act, 42 U.S.C.A. § 1973, and the purpose-or-effect standards of § 5 of the Voting Rights Act, 42 U.S.C.A. § 1973c even though preclearance of a court plan is not required.[21] *See Abrams v. Johnson,* 521 U.S. 74, 90, 96, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997); *Connor v. Johnson,* 402 U.S. 690, 691, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971) ("Section Five's preclearance mechanism does not apply to courts in creating remedial apportionment plans.").

■ "Section Two of the Voting Rights Act prohibits States from imposing or applying any voting practice or procedure that dilutes, denies, or abridges the right of any citizen of the United States to vote, on account of that citizen's race or color. In analyzing whether a particular apportionment plan complies with Section Two, a court must consider whether, under the totality of circumstances, minorities have been granted an equal opportunity to participate in the political process and to elect representatives of their choice. *Georgia v. Ashcroft,* 539 U.S. 461, 478, 123 S.Ct. 2498, 2510, 156 L.Ed.2d 428 (2003); *see also Abrams,* 521 U.S. 74 at 91, 117 S.Ct. 1925 (the "essence" of a § 2 vote dilution claim is that "a certain electoral law, practice, or

---

**20.** *Id.*

**21.** As accurately stated in the joint stipulation, a court must not act as a rubber stamp for a particular plan proposed by the parties; however, this does not mean that the court cannot consider the proposed legislative plan, just as it considers any other plans submitted to it. As long as the district court makes an independent, *de novo* decision as to the appropriate remedial plan, such that the plan is the court's own, its plan does not have to be precleared in accordance with the Voting Rights Act, even if it turns out to greatly resemble the proposed legislative plan. *See Smith, Perry,* 314 F.Supp.2d at 1295; *Johnson v. Miller,* 922 F.Supp. 1556, 1569 (S.D.Ga. 1995) (noting that fact that court's remedial plan may have resembled proposed legislative plan did not mean that plan was not the court's own; the court necessarily had to rely on legislative plans to determine how the latter had maintained district cores and communities of interest).

structure ... cause[s] an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.").

Section Five of the Voting Rights Act "has a limited substantive goal: " 'to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.' " *Georgia v. Ash-croft*, 539 U.S. at 477, 123 S.Ct. 2498. "[A] retrogression inquiry under § 5, 'by definition, requires a comparison of a jurisdiction's new voting plan with its existing plan.' " *Id.* at 478, 123 S.Ct. 2498. Here, the existing plan is the map drawn by the court in 2002.

The population and minority breakdown for the Court's final remedial plan in comparison to the benchmark 2002 plan is as follows:

| DISTRICTS | 2002 EXISTING BENCHMARK PLAN | 2012 FINAL REMEDIAL PLAN | DEVIATION |
|---|---|---|---|
| **DISTRICT 1** | | | |
| % TOTAL BLACK | 13.22% | 19.31% | +6.09% |
| % TOTAL BLACK VAP [22] | 12.41% | 17.78% | +5.37% |
| **DISTRICT 2** | | | |
| % TOTAL BLACK | 21.04% | 26.27% | +5.23% |
| % TOTAL BLACK VAP | 19.32% | 24.89% | +5.57% |
| **DISTRICT 3** | | | |
| % TOTAL BLACK | 8.29% | 14.69% | +6.40% |
| % TOTAL BLACK VAP | 7.59% | 13.34% | +5.75% |
| **DISTRICT 4** | | | |
| % TOTAL BLACK | 32.25% | 44.91% | +12.66% |
| % TOTAL BLACK VAP | 31.34% | 42.10% | +10.76% |

It is important to note that in preparing the minority breakdown, the Court has used the "total black" census figures. The Court recognizes that in her *amicus curiae* arguments, Ms. Famber–Powell asks the Court to add the Black and Hispanic voting age populations together in order to obtain an accurate representation of the total minority percentage. Doc. No. 24, p. 6. Plaintiffs objected anted the absence of binding precedent to this regard. The Court agrees as Ms. Famber–Powell's argument is not in accordance with historical application and authority under the Voting Rights Act. Doc. No. 24, p. 6. In fact, the most recent version of guidance from the Department of Justice's Civil Rights Division indicates that Hispanic voters are analyzed as a separate group for purposes of enforcement of the Voting Rights Act. *See* U.S. Dep't of Justice Guidance Concerning Redistricting & Retrogression Under Section 5 of the Voting Rights Act, 76 Fed.

22. "VAP" means voting age population.

Reg. 7470 (Feb. 9, 2011) ("As in the past, the Department will analyze Latino voters as a separate group for purposes of enforcement of the Voting Rights Act.")[23]

In regard to the Section Two analysis, after considering the totality of circumstances, the Court finds that under its Final Plan, there has been no dilution of the minority voting strength and minorities have been granted an equal opportunity to participate in the political process and to elect representatives of their choice.

■ In regard to the Section Five analysis, applicable factors have been set forth by the United States Supreme Court in the *Georgia v. Ashcroft* case, cited above.[24] Those factors are: (1) preserve current minority voting strength; (2) ensure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise; (3) look countywide at the minority population, do not focus on individual districts; (4) compara-

tive ability of minority group to elect a candidate of its choice; (5) extent to which a new plan changes the minority group's opportunity to participate in the political process; (6) whether the plan adds or subtracts influence districts in which minorities may not be able to elect a candidate of choice, but can play a substantial, if not decisive role in the electoral process; and (7) likelihood that candidates elected without decisive minority support would be willing to take the minority's interests into account. *Id.*

■ After considering these factors and the fact that the percentage of total black and percentage of total black voting age population increases from the benchmark figure in each district, as well it appearing from the evidence in the record that there is no *recognized* majority-minority district in County, the Court finds that there has been no retrogression in its remedial plan. *See* Doc. No. 29–1. The Court finds that its map conforms to the requirements of the Voting Rights Act in

23. Furthermore, to the extent that Ms. Famber–Powell's arguments concern minority representation in Cobb County, the Court notes that under its Final Plan, the Black voting age population increases are greater overall than under Ms. Famber–Powell's proposal.

| DISTRICTS | 2002 EXISTING BENCHMARK PLAN | 2012 FINAL REMEDIAL PLAN | Famber–Powell proposal |
|---|---|---|---|
| **DISTRICT 1** | | | |
| % TOTAL BLACK | 13.22% | 19.31% | 19.20% |
| % TOTAL BLACK VAP | 12.4% | 17.78% | 17.55% |
| | | | |
| **DISTRICT 2** | | | |
| % TOTAL BLACK | 21.04% | 26.27% | 32.10% |
| % TOTAL BLACK VAP | 19.32% | 24.89% | 30.10% |
| | | | |
| **DISTRICT 3** | | | |
| % TOTAL BLACK | 8.29 | 14.69% | 9.25% |
| % TOTAL BLACK VAP | 7.59 | 13.34% | 8.38% |
| | | | |
| **DISTRICT 4** | | | |
| % TOTAL BLACK | 32.25 | 44.91% | 44.37% |
| % TOTAL BLACK VAP | 31.37 | 42.10% | 41.39% |

24. The parties' briefs indicated that there may some question and/or confusion as to the definition of retrogression. All plaintiffs indicated a belief at the evidentiary hearing that a reduction in black voting age population alone does not constitute retrogression under Section 5.

that the changes do not have the effect of denying or abridging the right to vote because of race or color. In addition, the court's map comports with the non-retrogression requirement of Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c.

### C. Summary of the Court's plan

In summary, the Court has fashioned a remedy to Cobb County's existing unconstitutional districting plan. In arriving at this remedy in the attached Final Plan, the Court followed the constitutional mandate of one person, one vote, complied fully with § 2 and § 5 of the Voting Rights Act, and carefully adhered to Georgia's traditional principles of redistricting. "No plan of . . . redistricting created by court or legislature will achieve perfection. There are too many practical, political, and altogether human features in the equation. [The Court] do[es] no harm with this plan, which cures the unconstitutionality of the former and can serve in 'caretaker' status until the [Georgia Legislature] convenes to change it." *Johnson v. Miller,* 922 F.Supp. 1556, 1569 (S.D.Ga.1995).[25]

### CONCLUSION

The Plaintiff's request for declaratory judgment is **GRANTED.** The existing maps employed by Cobb County to elect members of the Board of Commissioners are malapportioned and unconstitutional, violative of the Equal Protection clauses of the Fourteenth Amendment to the United States Constitution and the Constitution of the State of Georgia, resulting in liability

for which injunctive relief can be granted under 42 U.S.C. § 1983.

The Plaintiff's request for injunctive relief is hereby **GRANTED.** Defendant Cobb County Board of Elections is hereby enjoined from qualifying candidates and conducting elections in accordance with the existing malapportioned districts.

The Plaintiff's request for remedial relief is hereby **GRANTED.** The redistricting plan for the Board of Commissioners of Cobb County drawn by the Court as set forth herein (and attached hereto as Exhibit A, entitled "CobbCC–FEDCT–2012") is hereby established as the interim remedial plan to be utilized by the Cobb County Board of Elections in all future elections for district commissioners of Cobb County until such time as the General Assembly of Georgia enacts and the Department of Justice preclears local legislation which redistricts the Board of Commissioners of Cobb County.

Attorney's fees are not awarded under 42 U.S.C. § 1988. *See Kay v. Ehrler,* 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991) (holding that a pro se litigant who is also a lawyer may not be awarded attorney's fees under 42 U.S.C. § 1988).

The Cobb County Board of Commissioners shall bear the costs of this action.

The Clerk is hereby **DIRECTED** to enter judgment in accordance with the present order, and thereafter terminate this action

**IT IS SO ORDERED.**

---

**25.** The Court would also like to express its thanks to its court appointed expert, Regina Harbin Wright and consultant, Brian Knight for their invaluable expertise and knowledge in working with the Court to draw the interim map.

1354

Cobb County Commission Districts- as drawn by Federal Court- 2012

Plan Name: CobbCC-FEDCT-2012    Plan Type : Local    User: Ginn    Administrator: FedCt

| DISTRICT | | POPULATION | DEVIATION | % DEVIATION | BLACK | % BLACK | BLACK COMBO | TOTAL BLACK | %TOTAL BLACK | HISP. OR LATINO | %HISP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | | 172,011 | -8 | 0 00% | 31,430 | 18.27% | 1,778 | 33,208 | 19 31% | 16,543 | 9.62% |
| | VAP | 125,850 | | | 21,653 | 17 21% | 727 | 22,380 | 17.78% | 10,443 | 8 30% |
| 002 | | 172,060 | 41 | 0.02% | 42,832 | 24.89% | 2,376 | 45,208 | 26.27% | 19,475 | 11 32% |
| | VAP | 134,873 | | | 32,314 | 23.96% | 1,258 | 33,572 | 24 89% | 13,004 | 9 64% |
| 003 | | 171,930 | -89 | -0.05% | 23,389 | 13.60% | 1,876 | 25,265 | 14 69% | 14,435 | 8.40% |
| | VAP | 128,151 | | | 16,347 | 12.76% | 743 | 17,090 | 13 34% | 9,398 | 7.33% |
| 004 | | 172,077 | 58 | 0.03% | 74,123 | 43.08% | 3,161 | 77,284 | 44.91% | 33,877 | 19.60% |
| | VAP | 122,717 | | | 50,288 | 40.98% | 1,381 | 51,669 | 42.10% | 20,235 | 16.49% |

Total Population    688,078
Ideal Value:    172,019
*Summary Statistics*
Population Range.    171,930    to    172,077
Absolute Overall Range:    147
Relative Range:    -0 05%    to    0 03%
Relative Overall Range.    0.09%

## Cobb County Commission Districts- as drawn by Federal Court- 2012

CobbCC-FEDCT-2012

Plan: CobbCC-FEDCT-2012
Plan Type: Local
Administrator: FedCt
User: Gina

District 001
Cobb County
VTD: 067AC1A - ACWORTH 1A
VTD: 067AC1B - ACWORTH 1B
030101:
```
2001  2003  2004  2010  2022  2023  2024  2025  2026  2027  2028  2031
2032  2033  2034  2035  2037  2039  2040  2041  2042  2043  2044  2045
2061
```
030103:
```
1000  1004  1005  1006  1007  1009  1010  1011  1012  1013  1014  1022
1035  1037  1039  1041  2014  2015  2016  2021  2042  2043  2044  2048
2049
```
030104:
```
1000  1001  1002  1003  1004  1005  1006  1007  1008  1009  1011  1012
1013  1014  1015  1016  1017  1018  1019  1020  1021  1022  1023  1024
1025  1026  2000  2002  2004  2005  2007  2008  2009  2010  2011  2012
2013  2015  2017  2018  2019  2020  2022  2024  2026  2027  2028  2029
2030  2031  2032  2033  2034  2035  2036  2037  2038  2039  2040  2041
```
030106:
```
3016  3017  3018  3019
```
VTD: 067AC1C - ACWORTH 1C
030103:
```
2012  2018  2019  2026  2046  3055  3059  3060  3062
```
030106:
```
3022
```
030224:
```
2022  2023  2024  2025  2026  2028  2029
```
VTD: 067BG01 - BIG SHANTY 01
VTD: 067CH02 - CHEATHAM HILL 02
VTD: 067CH03 - CHEATHAM HILL 03
VTD: 067DI01 - DOBBINS 01
030800:
```
3043  3044  3046  3047  3052
```
VTD: 067DL01 - DOWELL 01
VTD: 067DU01 - DURHAM 01
VTD: 067FO06 - FAIR OAKS 06
VTD: 067FR01 - FORD 01
VTD: 067FY01 - FREY 01
VTD: 067HR01 - HARRISON 01
VTD: 067HY01 - HAYES 01
VTD: 067KE1A - KENNESAW 1A
VTD: 067KE2A - KENNESAW 2A
VTD: 067KE2B - KENNESAW 2B
VTD: 067KE3A - KENNESAW 3A
030226:
```
1013  1014  1015  1016  1017  1024  1025  1026  1039  1043
```
030227:
```
1000  1002  1003  1004  1005  1006  1007  1008  1009  1010  1011  1012
1013  1014  1015  1016  1017  1018  1019  1020  1021  1022  2000  2001
2008  2025  2026  2027  2028  3026  3027
```
030229:
```
2031  2032
```
VTD: 067KE4A - KENNESAW 4A
VTD: 067KE5A - KENNESAW 5A
VTD: 067KP01 - KEMP 01
VTD: 067KP02 - KEMP 02
VTD: 067KP03 - KEMP 03

## 1358

```
VTD: 067LM01 - LOST MOUNTAIN 01
VTD: 067LM02 - LOST MOUNTAIN 02
VTD: 067LM03 - LOST MOUNTAIN 03
VTD: 067LM04 - LOST MOUNTAIN 04
VTD: 067LW01 - LEWIS 01
VTD: 067ML01 - MCCLURE 01
VTD: 067MR1A - MARIETTA 1A
030800:
  3001  3018  3019  3028  3029  3030  3050
VTD: 067MR2A - MARIETTA 2A
VTD: 067MR2B - MARIETTA 2B
VTD: 067MR2C - MARIETTA 2C
VTD: 067MR3A - MARIETTA 3A
VTD: 067MR4B - MARIETTA 4B
030230:
  1080  2037  2038  2044  2045  2046  2047  2048  2049  2050  2055  2056
  2057  2059  2063  2064  2065  2069  2071  2072  2073
030602:
  1019  1028  1030  1044  1045  1046
030700:
  1006  1007  1008  1014  1015  1016  1017  1018  1034  2000  2001  2002
  2003  2004  2005
VTD: 067MR4C - MARIETTA 4C
VTD: 067MR4E - MARIETTA 4E
030602:
  1002  1003  1005  1009  1010  1012  1013  1015  1016  1017  1018  1022
  1023  2048  2049  2050  2051  2052  2056  2057  2058  2059  2060  2061
  2062  2063  2065  3018  3019  3020  3021  3022  3023  3024  3025  3026
  3027  3028  3029  3030  3031  3032  3033  3034  3035  3036  3037  3038
  3039  3040  3041  3042  3045  3046  3047  3048  3049  3050  3051  3060
  3061  3062  3063  3064  3065  3066  3070  4007
030700:
  2018  2019  2020  2022  2023  2024
VTD: 067MR5A - MARIETTA 5A
030602:
  3067  3068  3069  3071  3072  3073  3074  3075  3076  3077  3078  3079
  3080  3081  3082  3083
030700:
  2021  2025  3002  3003  3004  3005  3006  3007  3008  3009  3010  3011
  3012  3013  3014  3015  3016  3017  3018  3019  3020  3021  3022  3023
  3024  3025  3026  3027  3028  3029  3030  3031  3032  3033  3034  3048
  3049  3050  3051  3052
030800:
  3002  3003  3004  3005  3006  3007  3008  3009  3010  3013  3014  3015
  3016  3034  3035  3036
030902:
  1000  1001  1002  1003  1004  1007  1008  1011  1012  1013  1014  1015
  1016  1017  1018  1019  1020  1021  1022  1023  1024  1038  4000
VTD: 067MR5B - MARIETTA 5B
030700:
  1019  1027  1028  1030  1031  1032  2006  2007  2008  2009  2010  2011
  2012  2013  2014  2015  2016  2017  3000  3001
VTD: 067MS01 - MARS HILL 01
VTD: 067MS02 - MARS HILL 02
VTD: 067NC01 - NORTH COBB 01
030103:
  1052  1053  1054  1058  1063  2011  2017  2020  2022  2024  2045  2052
  3001  3002  3005  3007  3013  3015  3018  3021  3028  3029  3030  3034
  3035  3037  3041  3043  3045  3046  3047  3048  3050  3052  3054  3058
  3061
030104:
  2001  2003  2006  2014  2016  2021  2023  2025
030106:
```

CobbCC-FEDCT-2012

```
 3021  3023  3024  3025
030224:
 1001  1004  1022  1023  1024  1026  1027  1029  1030  2009  2010  2015
 2020  2027  2032  2035  2036
VTD: 067OR01 - OREGON 01
VTD: 067OR03 - OREGON 03
VTD: 067OR05 - OREGON 05
VTD: 067PM01 - PINE MOUNTAIN 01
VTD: 067PM02 - PINE MOUNTAIN 02
VTD: 067PR01 - PALMER 01
030226:
 1038  1042
030229: .
 2006  2009  2010  2011  2022  2023  2026  2028  2029  2088
VTD: 067RR01 - RED ROCK 01
VTD: 067VA01 - VAUGHAN 01

District 002
Cobb County
VTD: 067BY01 - BRUMBY 01
VTD: 067CA01 - CHATTAHOOCHEE 01
VTD: 067DC01 - DICKERSON 01
VTD: 067DI01 - DOBBINS 01
030339:
 1003
030344:
 2004  2005  2008  2012  2013  2014  2017  2020  2021  2022  2023  2024
 2025  2026  2027  2028  2029  2030  2031
030345:
 1001  1002  1003  1004  1005  1006  1008  1009  1010  1011  1018  1022
 1023  1024  1025  1035  1037  1042  1046  1047  1048  1049  1050  1051
 1053  1054  1055  1056  1057  1058  1059  1061  1066
030412:
 2007  2009  2011  2012  3001  3002  3004  3007  3008  3009  3011  3012
 3013  3015  3016  3017  3018  3019
030413:
 1017  1018
030414:
 1003  1004  1005  1006  1007  1008  1009  1010  1011  1012  1013  1014
 1015  1016  1017  1018  1019  1020  1021  1022  1023  1024  1027  1029
 1030  2005  2009  2017  2018  2020  2021  2022  2027  2029  2030  2031
 2032  2058  2059  2060  2061  2062  2063
031108:
 1007  1009  1015  1021  1024  1029  1033  1035  1036  1038  1039  1041
 1043  1047  1050  2002  3008  3009  3013  3015  3025  3030  3032  3033
 3034  3036  4005  4006  4011  4014  4015  4018  4019  4023
031113:
 1005  1015  1016
031114:
 2002  2005
031207:
 1000
031208:
 1001  1002  1015  1023
VTD: 067DO01 - DODGEN 01
VTD: 067EA01 - EASTSIDE 01
VTD: 067EV01 - EAST VALLEY 01
VTD: 067FP01 - FULLERS PARK 01
VTD: 067LI01 - LINDLEY 01
031205:
 1025  1026  1027  1028  1029  1030  1046  1047  1048  1052  1053  1054
031206:
 1092  1097  1098  2012  2013
```

CobbCC-FEDCT-2012

```
VTD: 067MA04 - MABLETON 04
031206:
 1056  1082        .
VTD: 067MR1A - MARIETTA 1A
030344:
 2006  2015  2016  2018  2019  2032  2033
030345:
 1007  1015  1016  1017  1019  1021  1043  1044  1045
030405:
 1033  1035  1036  1038  1039  1040  1041  1042  1043  1048  1049  1050
 1051  1052  1054  1055  1056  1057  1058  1059  1060  2010  2013  2014
 2015  2016  2017  2018  2019  2027  2028  2033  2035  3006  3007  3008
 3010  3017  3018  3019  3020  3024  3025  3028  3031  3033  3034  3037
 3038  3039  3044  3047  3048
030413:
 1000  1001  1003  1004  1005  1006  1009  1010  1015  2000  2001  2002
 2003  2005  2007  2016  3001  3008  3009  3010  3011  3031
030414:
 1000  1001  1002  1025  1026  1028  2000  2001  2002  2003  2004  2008
 2011  2012  2023  2033  2034  2038  2039  2045  2050  2051  2052  2053
 2054  2055  2056  2057  2065
030800:
 1004  1005  1006  1007  1008  1009  1010  1011  1012  1013  1014  1015
 1016  1017  1018  1019  1020  1021  1022  1023  1024  1025  1027  1028
 1029  1030  1031  1032  1033  1034  2020  2021  2023  2026  2032  2033
 2034  2035  2039  2040  2041  2042  2043  2044  2047  2048  2050  2051
 2052  2053  2054  3000  3011  3012  3023  3025  3042  3051
031001:
 2000  2004  2007  2026  2079  2080  2083  2084  2085  2086  2088  2090
 2091  2092  2093  2094  2095  2096  2097
031113:
 1000  1001  1002  1003  1004  1006  1007  1008  1009  1010  1011  1012
 1013  1014
031114:
 2000  2001  2009
VTD: 067MR5A - MARIETTA 5A
030411:
 2003
030700:
 3035  3036  3037  3038  3039  3040  3041  3042  3043  3044  3045  3046
 3047  4004  4006  4007  4008  4009  4010  4011  4012  4015  4016  4017
 4018  4019  4020  4021  4022  4023  4024  4025  4026  4027  4028  4029
 4030  4033  4034
030800:
 1000  2000  3020  3021  3022  3024  3026  3027
VTD: 067MR6A - MARIETTA 6A
VTD: 067MR6C - MARIETTA 6C
030410:
 1010  1012  1014  1015  1016  1023  1025  1026  2017  2018  2019  2020
 2023  2024  2025  2026  2027  2028  2029  2030  2031
030505:
 1002  1005  1009  1012  1013  2000  2001  2002  2003  2004  2005  2006
 2012  2013  2021  3020  3022  3023  3027  3028  3029  3030  3032  3033
VTD: 067MR7A - MARIETTA 7A
VTD: 067MT01 - MT BETHEL 01
VTD: 067MT02 - MT BETHEL 02
VTD: 067MT03 - MT BETHEL 03
VTD: 067MT04 - MT BETHEL 04
VTD: 067NJ01 - NICKAJACK 01
VTD: 067NP01 - NORTON PARK 01
031115:
 2002  2006  2031  2032  2033  2037  2038  2048  2049
031117:
```

CobbCC-FEDCT-2012

```
 2025   2026
031118:
 1002   1008   1009
VTD: 067OK01 - OAKDALE 01
VTD: 067PF01 - POWERS FERRY 01
VTD: 067RW02 - ROSWELL 02
VTD: 067SM03 - SEWELL MILL 03
VTD: 067SM04 - SEWELL MILL 04
VTD: 067SM05 - SEWELL MILL 05
VTD: 067SN1A - SMYRNA 1A
VTD: 067SN2A - SMYRNA 2A
VTD: 067SN2B - SMYRNA 2B
031108:
 3000   3001   3002   3003   3004   3005   3006   3007   3010   3011   3012   3014
 3016   3017   3018   3019   3020   3021   3022   3023   3024   3031   3035   4004
 4008
031114:
 1000   2003   2004   2006   2007   2008   2010   2011   2012   2013   2014   2015
 2016   2017   2018
VTD: 067SN3A - SMYRNA 3A
VTD: 067SN4A - SMYRNA 4A
VTD: 067SN5A - SMYRNA 5A
031001:
 2076   3023   3026   3027   3029
031002:
 1038
031004:
 1000   1001   1002   1004   1008
031101:
 1000   1001   1002   1003   1004   1005   1006   1007   1008   1009   1010   1011
 1012   1013   1014   1015   1016   1017   1018   3000   3001   3002   3003   3004
 3005   3006   3007   3008   3009   3010   3011   3012   3013   3014   3015   3016
 3017
031110:
 1005   1006   1007   1008   1009   1016   1017   1018
031116:
 1000   1001   1021   1022   1023   1024   1025   1026   1027   1028   1029   1030
 1031   1032   1037   1038   1039   1040   1041   1042   3000   3001   3002   3004
 3005   3013   3014   3015
VTD: 067SN6A - SMYRNA 6A
VTD: 067SN7A - SMYRNA 7A
031117:
 2008   2009   2010   2011   2012   2013   2014   2015   2016   2017   2018   2019
 2020   2021   2022   2023   2024
031118:
 2012   2013   2014   2015   2016   2017   2018   2020   2021   2022   2023   2031
031307:
 3000
VTD: 067SN7B - SMYRNA 7B
031118:
 2008   2009   2010   2025   2026
031206:
 1022   1023   1030   1031   1032   1033   1034   1035   1039   1041   1042   1043
 1045   1051   1053   1054   1055   1057   1058   1059   1060   1061   1062   1063
 1064   1066   1067   1069   1070   1071   1072   1073   1076   1077   1078   1079
 1081   1083   1084   1085   1086   1087   1088   1089   1090   1091   1093   1094
 1095   1096   2005   2006   2007   2008   2009   2010   2011   2015   3043   3046
 3047   3048   3054   3055   3058   3061   3064   3065   3066   3067  ·3074   3077
 3085   3086   3087   3088   3089   3091   3092   3100   3101
VTD: 067SN7C - SMYRNA 7C
031117:
 2002   2003   2004   2005   2006   2007
031118:
```

# 1362

```
 1025  1026  1028  1029  1032  1033  1034  3017  3018
VTD: 067SO01 - SOPE CREEK 01
VTD: 067SO02 - SOPE CREEK 02
VTD: 067SO03 - SOPE CREEK 03
VTD: 067SP01 - SEDALIA PARK 01
VTD: 067TM01 - TERRELL MILL 01
VTD: 067TS01 - TEASLEY 01
VTD: 067VG01 - VININGS 01
VTD: 067VG02 - VININGS 02
VTD: 067VG03 - VININGS 03
VTD: 067VG04 - VININGS 04

District 003
Cobb County
VTD: 067AC1B - ACWORTH 1B
030106:
 3005  3006  3007  3008  3009  3010  3011  3012  3013  3014  3015  3020
 3026  3027  3028  3029
030107:
 2014  2018
VTD: 067AC1C - ACWORTH 1C
030103:
 2002  2003  2004  2005  2007  2009  2010  2025  2027  2028  2029  2034
 2039  2040  2053  2054
030106:
 1000  1003  1006  1007  1008  1009  1010  1011  1013  1019  1021  2000
 2002  2003  2005  2006  2007  2009  2012  2014  2015  2016  2017  2019
 2020  3000  3001  3002  3003  3004
030107:
 2009  2010  2011  2012
VTD: 067AD01 - ADDISON 01
VTD: 067BF01 - BELLS FERRY 01
VTD: 067BF02 - BELLS FERRY 02
VTD: 067BF03 - BELLS FERRY 03
VTD: 067BG02 - BIG SHANTY 02
VTD: 067BK01 - BAKER 01
VTD: 067BW01 - BLACKWELL 01
VTD: 067CK01 - CHALKER 01
VTD: 067CK02 - CHALKER 02
VTD: 067CR01 - CHESTNUT RIDGE
VTD: 067DV01 - DAVIS 01
VTD: 067EC01 - EAST COBB 01
VTD: 067EL01 - ELIZABETH 01
VTD: 067EL02 - ELIZABETH 02
VTD: 067EL03 - ELIZABETH 03
VTD: 067EL04 - ELIZABETH 04
VTD: 067EL05 - ELIZABETH 05
VTD: 067EL06 - ELIZABETH 06
VTD: 067EP01 - EAST PIEDMONT 01
VTD: 067GM01 - GARRISON MILL 01
VTD: 067GT01 - GRITTERS 01
VTD: 067HT01 - HIGHTOWER 01
VTD: 067KE3A - KENNESAW 3A
030223:
 1015  2002  2003  2004  2007  2010
030226:
 1020  1021  1027  1028  1030  1031  1035  1036  1040
VTD: 067KE5B - KENNESAW 5B
VTD: 067KL01 - KELL 01
VTD: 067KY01 - KEHELEY 01
VTD: 067LA01 - LASSITER 01
VTD: 067MB01 - MABRY 01
VTD: 067MD01 - MURDOCK 01
```

```
VTD: 067MK01 - MCCLESKEY 01
VTD: 067MR4B - MARIETTA 4B
030506:
 1124  1130  1133
030601:
 1018  1020  1021  1022  1023  1024  1025  1026  1027  1039  1042  3036
 3038  3039  3040  3042  3043  3044  3045  3046  3047  3048  3059  3060
 3061  3062  3071  3076  3078  3080  3081  3084  3087
VTD: 067MR4E - MARIETTA 4E
030601:
 3058  3074  3075
030602:
 2002  2003  2037  2040  2041  2042  2043  2053  2054  2055  2064  3000
 3006  3007  3008  3009  3010
VTD: 067MR5A - MARIETTA 5A
030504:
 3006  3007  3010  3011  3012  3013  3014  3015
030505:
 4000  4001  4002  4003  4004  4005  4006  4007  4008  4015
030700:
 1024  1025  1026  1033  1035  4000  4001  4002
VTD: 067MR5B - MARIETTA 5B
030502:
 2028  2032  2034  2040  2041  2042  2043  2044  2045  2046  2052  2053
 2054  2056  2057  2058
030504:
 2023  2024  2033  3000  3001  3002  3003  3004  3005  3008  3009
030506:
 1002  1032  1033  1034  1036  1037  1038  1039  1041  1042  1043  1044
 1046  1047  1051  1052  1053  1079  1080  1081  1082  1083  1084  1086
 1089  1092  1097  1099  1100  1101  1104  1105  1106  1108  1109  1110
 1111  1112  1113  1114  1115  1116  1117  1118  1119  1120  1121  1122
 1134  1135  1136  1137  1138  1139
030602:
 2012  2014  2015  2016  2017  2018  2019  2020  2021  2022  2023  2024
 2025  2026  2027  2029  2030  2031  2032  2033  2034  2035  2036  2038
 2039  2044  2045  2046  2047  3012  3013  3014  3015  3016  3017
030700:
 1000  1001  1002  1003  1004  1005  1009  1010  1011  1012  1013  1020
 1021  1022  1023  1029  4005
VTD: 067MR6B - MARIETTA 6B
VTD: 067MR6C - MARIETTA 6C
030502:
 2006  2009  2012  2014  2017  2020  2026  2035  2039  2055
030504:
 2010  2011  2021  2022  2026  2027  2028  2029  2030  2031  2032  2035
 2037
030505:
 1010  1015  1016  1017  1018  1019  1021  1022  1023  4009  4010  4011
 4012  4013  4014  4016  4017  4018  4019  4020  4028  4029  4030  4031
 4032
030506:
 1025  1026  1054  1057  1063  1069  1070  1071  1074  1075  1078  1145
 1148
030507:
 1059  1060  1061  1064  1065  1066  1067  1068  1070  1071  1073  1074
030700:
 4003  4013  4014  4031  4032
VTD: 067NC01 - NORTH COBB 01
030103:
 2000  2001  2006  2008  2013  2030  2031  2035  2047
030106:
 1018  2013  2018
```

```
030107:
 2017
VTD: 067NS01 - NICHOLSON 01
VTD: 067PO01 - POST OAK 01
VTD: 067PP01 - POPE 01
VTD: 067PR01 - PALMER 01
030220:
 1000  1001  1002  1003  1004  1005  1006  1007  1008  1009
030223:
 2000  2001  2005  2006  2008  2009
030226:
 1032  1033  1034  1037
VTD: 067PT01 - PITNER 01
VTD: 067RM01 - ROCKY MOUNT 01
VTD: 067RM02 - ROCKY MOUNT 02
VTD: 067RW01 - ROSWELL 01
VTD: 067SA01 - SANDY PLAINS 01
VTD: 067SF01 - SHALLOWFORD FALLS
VTD: 067SI01 - SIMPSON 01
VTD: 067SM01 - SEWELL MILL 01
VTD: 067SY01 - SPRAYBERRY 01
VTD: 067TR01 - TIMBER RIDGE 01
VTD: 067TT01 - TRITT 01
VTD: 067WG01 - WADE GREEN 01
VTD: 067WG02 - WADE GREEN 02
VTD: 067WL01 - WILLEO 01

District 004
Cobb County
VTD: 067AU1A - AUSTELL 1A
VTD: 067BR01 - BIRNEY 01
VTD: 067BR02 - BIRNEY 02
VTD: 067BT01 - BRYANT 01
VTD: 067BT02 - BRYANT 02
VTD: 067CL01 - CLARKDALE 01
VTD: 067CL02 - CLARKDALE 02
VTD: 067CO01 - COOPER 01
VTD: 067DI01 - DOBBINS 01
030800:
 2045  2046  2049  2057  3041  3048  3049
031001:
 2001  2002  2003  2005  2006  2008  2009  2010  2011  2012  2013  2014
 2015  2016  2017  2018  2019  2020  2021  2022  2023  2024  2025  2027
 2028  2029  2030  2031  2032  2033  2034  2035  2036  2037  2038  2039
 2040  2041  2042  2043  2044  2045  2046  2047  2048  2049  2050  2051
 2052  2053  2054  2055  2057  2058  2059  2060  2061  2062  2063  2064
 2065  2077  2078  2087  2089  2098  2099  2100  2101
031108:
 1000  1001  1002  1004  1012  1013
VTD: 067FO01 - FAIR OAKS 01
VTD: 067FO02 - FAIR OAKS 02
VTD: 067FO03 - FAIR OAKS 03
VTD: 067FO04 - FAIR OAKS 04
VTD: 067FO05 - FAIR OAKS 05
VTD: 067HL01 - HARMONY-LELAND
VTD: 067LI01 - LINDLEY 01
031313:
 1020  1024  1031  1032  1033  1035  1036  1037  1038  1039  1040  1041
 1042  1044  1045  1046  1047  1048  1049  1050  1051  1052  1053  1054
 2000  2001  2002  2003  2004  2006  2007  2008  2009  2010  2011  2013
 2014  2015  2016  2017  2019  2020  2021  2024  2025  2026  2027  2028
 2029  2030  2031  2032  2033  2034  2035  2036  2037  2038  2040  2041
 2042  2043  2044  2045  2046  2047  2049  2050  2051  2052  2055  2056
```

CobbCC-FEDCT-2012

```
2057   2060   2062   2064   2065   2066   2068   2069   2070   2071   2072   2074
2075   2076   2077   2078   2079   2081   2082   2083   2084   2085   2086   2087
```
VTD: 067MA01 - MABLETON 01
VTD: 067MA02 - MABLETON 02
VTD: 067MA03 - MABLETON 03
VTD: 067MA04 - MABLETON 04
031307:
```
1000   1003   1006   3005   3007   3008   3009   3010   3011   3012   3013   3014
3015   3016   3017   3018   3019   3020   3021   3022   3023   3024   3025   3026
3027   3028   3029   3030   3031   3032   3033   3037   3040   3044   3046   3048
3049   3050   3051   3052   3053   3054   3055   3057   3058
```
VTD: 067MC01 - MACLAND 01
VTD: 067MC02 - MACLAND 02
VTD: 067ME01 - MCEACHERN 01
VTD: 067NP01 - NORTON PARK 01
031106:
```
2027   2028
```
031115:
```
2009   2016   2034   2040   2041   2042   2043   2044   2052   2053   2054
```
031117:
```
1001   1002   1003   1004   1005   1006   1008   1009   1012   1014   1016   1017
1018   1019   1021   1025   1026   1027
```
VTD: 067NP02 - NORTON PARK 02
VTD: 067OR02 - OREGON 02
VTD: 067OR04 - OREGON 04
VTD: 067OR06 - OREGON 06
VTD: 067PE01 - PEBBLEBROOK 01
VTD: 067PE02 - PEBBLEBROOK 02
VTD: 067PS1A - POWDER SPRINGS 1A
VTD: 067PS2A - POWDER SPRINGS 2A
VTD: 067PS3A - POWDER SPRINGS 3A
VTD: 067RS01 - RIVERSIDE 01
VTD: 067SN2B - SMYRNA 2B
031001:
```
2056
```
VTD: 067SN5A - SMYRNA 5A
031002:
```
1020
```
031108:
```
1011   1019
```
031115:
```
2007   2008   2010   2011   2012   2013   2014   2015   2017
```
031116:
```
1002   1003   1004   1005   1006   1007   1009   1010   1012   1013   1033   1043
1044   2001   2002   2003   2004   2015   3003   3006   3007   3008   3009   3010
3011   3012   3017
```
VTD: 067SN7A - SMYRNA 7A
031307:
```
3001   3002   3003   3004   3006   3034   3060
```
VTD: 067SN7B - SMYRNA 7B
031307:
```
1001   1002   1004   1005   1007   1008   1009   1011   1013   1014   1015   1016
1017   1022   1026   3035   3036   3038   3039   3041   3042   3043   3045   3047
3056   3059
```
031313:
```
1000   1001   1002   1003   1004   1005   1006   1007   1008   1009   1010   1011
1012   1013   1014   1015   1017   1018   1019   1021   1022   1023   1027   1034
2005   2012   2018   2022   2023   2039   2048   2053   2054   2058   2059   2061
2063   2067   2073   2080   2088
```
VTD: 067SN7C - SMYRNA 7C
031117:
```
1000   1007   1010   1011   1013   1015   1020   1022   1023   1024
```
VTD: 067SW01 - SWEETWATER 01

CobbCC–FEDCT–2012

```
VTD: 067SW02 - SWEETWATER 02
VTD: 067SW04 - SWEETWATER 04
VTD: 067SW05 - SWEETWATER 05
```

## ORDER NUNC PRO TUNC
## AS TO FINAL ORDER

The Court hereby deletes the following sentence in its final order issued May 9, 2012 at Doc. No. 45, p. 31. "The current population of Roswell 01 is 3360 and Timber Ridge is 3360." Said deleted sentence is hereby replaced with the following sentence: "**The current population of Roswell 01 is 3062 and Timber Ridge is 3360.**"

**IT IS SO ORDERED.**